## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                                   Plaintiff,

                v.                            C.A. No. __-_____

                                             JURY TRIAL
                                             DEMANDED

MEDIENT STUDIOS, INC., FONU2,
INC., MANU KUMARAN, JOEL A.
"JAKE" SHAPIRO, and ROGER
MIGUEL,

                                   Defendants.

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its

complaint and alleges that:

## SUMMARY

1.      This case involves a microcap fraud scheme and numerous violations

of the antifraud, reporting, and registration provisions of the federal securities

laws.

2.      The violations principally concern Medient Studios, Inc. ("Medient"),

a public microcap company based outside of Savannah, Georgia that subsequently

went by the name Moon River Studios, Inc.  Between at least late 2012 and early 2015, Medient purported to be a movie and video game producer and also claimed to be building the largest movie studio in North America—the so-called "Studioplex"—on a 1,560-acre parcel of undeveloped land in Effingham County, Georgia, which is near Savannah.

3.     In early 2015, having failed to release a single movie or video game as a public company, and with no construction having started on the Studioplex, Medient announced that it was closing its doors, having purportedly transferred substantially all of its assets to a different public company called Fonu2, Inc. ("Fonu2").

4.     At the time of the Medient-to-Fonu2 asset transfers, Medient's CEO was Joel A. ("Jake") Shapiro ("Shapiro"), who had also recently become Fonu2's Chairman.  Shapiro remains Fonu2's Chairman today, and Fonu2—which moved its headquarters to Medient's old offices outside of Savannah after the asset transfers—claims to be "doing business as" Moon River Studios.

5.     The defendants in this action are Medient, Fonu2, Shapiro, former Medient CEO and Chairman Manu Kumaran ("Kumaran"), and current Fonu2 CEO Roger Miguel ("Miguel") (collectively, "Defendants").

6.     Defendants, among other things, made numerous false statements in Medient press releases and public filings and backdated and falsified purported Medient and Fonu2 company promissory notes, all while issuing billions of shares of the companies' common stock at significant discounts to third-party microcap financing companies who promptly dumped their stock into the public markets. Medient, Shapiro, and Kumaran all benefitted financially as a result of the transactions with third-party microcap financing companies.

7.     Defendants also committed an assortment of reporting and securities registration violations between 2013 and 2015, including failing to properly report unregistered sales of equity securities, failing to properly report the transactions in which Medient transferred substantially all of its assets to Fonu2, and failing to properly report the resignation of certain Medient officers and directors.

8.     Defendants benefitted financially from the fraudulent scheme.  For example, after claiming publicly that he did not draw a salary from Medient and telling shareholders that all funds raised by the company were being used to benefit the company, Kumaran used Medient to fund a lavish, globetrotting lifestyle that saw him spend an average of over $1,700 per day on travel and personal expenses between April 2014 and his termination in June 2014 alone.

9.     Similarly, Shapiro used significant amounts of funds raised through Medient's share issuances to pay his salary, and (after becoming CEO of Medient) his personal expenses.  Later, while Chairman of Fonu2, he used funds derived from Fonu2 share issuances to pay his salary and purchase a near million-dollar house.

10.     Additionally, Miguel traded extensively in Fonu2 stock in the months prior to the public announcement of the Medient-to-Fonu2 transactions, acquiring hundreds of millions of shares of the company while in possession of material nonpublic information about the upcoming asset transfers.  Miguel's shares more than doubled in value the day after the first Medient-to-Fonu2 transaction was publicly announced, generating unexercised profits of nearly $30,000.

## **VIOLATIONS**

11.     Medient engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c)  and 77q(a)], as well as Sections 10(b), 13(a) and 14(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a) and 78n(c)] and Rules

10b-5, 12b-20, 13a-1, 13a-11, and 14c-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.14c-6].

12.     Fonu2 engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], as well as Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

13.     Kumaran engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], as well as Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

14.     Kumaran also engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constitute and will constitute aiding and abetting Medient's violations of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)h and 77q(a)], as well its violations of Sections 10(b), 13(a) and 14(c) of the

Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78n(c)] and Rules 10b-5, 12b-20, 13a-1 and 14c-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.14c-6].

15.     Shapiro engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], as well as Sections 10(b), 13(d), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), and 78p(a)] and Rules 10b-5, 13d-1, and 16a-3 thereunder [17 C.F.R. §§240.10b-5, 240.13d-1, and 240.16a-3].

16.     Shapiro also engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute aiding and abetting Medient's and Fonu2's violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], as well as their violations of Sections 10(b), 13(a), and 14(c) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78n(c)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 14c-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.14c-6].

17.     Miguel engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], as well as Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

18.     Miguel also engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute aiding and abetting Fonu2's violations of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], as well as its violations of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

19.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78u-1], to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, and for civil penalties and other equitable relief.

20.     The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

21.     Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation or communication in interstate commerce, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint, and made use of the mails and means of instrumentality of interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this Complaint.

22.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Georgia.  In addition, Shapiro and Miguel currently reside in the Southern District of Georgia; Kumaran resided in the Southern District of Georgia during the period of his relevant conduct; Medient and Fonu2 have their principal places of business in the Southern District of Georgia; and multiple public investors in Medient and Fonu2 resided in the Southern District of Georgia at the time of their securities purchases.

8

23.     As such, venue is proper under Section 22 of the Securities Act [15 U.S.C. § 77v] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa].

## THE DEFENDANTS

24.     **Medient Studios, Inc., a/k/a Moon River Studios, Inc.** is a Nevada corporation with its headquarters in Rincon, Georgia.  Medient's securities are registered with the Commission pursuant to Section 12(g) of the Exchange Act. On June 25, 2014, the Commission suspended trading in Medient's securities for ten business days due to questions about the accuracy of publicly disseminated information concerning, among other things, the company's amount of total shares outstanding.  Prior to the trading suspension, Medient's common stock was quoted on the OTC Link (operated by OTC Markets Group, Inc.) under the ticker symbol "MDNT."  In August 2014, Medient's board of directors approved a resolution to change the name of the company to "Moon River Studios, Inc."  In February 2015, Medient transferred virtually all of its assets to Fonu2, which was then located in Fort Lauderdale, Florida, and all remaining Medient directors and officers other than Shapiro resigned.  And on April 10, 2015, Shapiro purportedly resigned, leaving Medient with no apparent directors or officers.

25.     **Fonu2, Inc.** is a Nevada corporation with its headquarters in Rincon, Georgia.  It is currently operating under the name Moon River Studios.  Fonu2's

9

securities are registered with the Commission pursuant to Section 12(g) of the Exchange Act, and its common stock is quoted on the OTC Pink Market (also operated by OTC Markets Group, Inc.) under the ticker symbol "FONU."  Prior to acquiring Medient's assets in February 2015, Fonu2 was a publicly traded "social commerce" company headquartered in Fort Lauderdale, Florida.  Prior to that, Fonu2 was known as Zaldiva, Inc., a publicly-traded comic book and collectibles business.  On June 28, 2016, Fonu2 filed a Form 15 with the Commission to deregister its securities under Section 12(g) of the Exchange Act.

26.    **Manu S. Kumaran**, age 46, is an Indian citizen who previously resided in Savannah, Georgia and, upon information and belief, currently resides in London, England.  Kumaran founded Medient, and served as its Chairman, CFO, and CEO until June 9, 2014, at which time he was terminated.  Kumaran currently promotes himself as the CEO of an entity referred to as Mediente International Films, which has no known legal connection to Medient.

27.    **Joel A. ("Jake") Shapiro**, age 45, is a resident of Savannah, Georgia. Shapiro was, among other things, Medient's President of Corporate Finance until June 9, 2014, at which point he became Medient's CEO.  Shapiro also purportedly became Medient's CFO, secretary, and sole director on February 26, 2015, and

claimed to resign all positions with Medient on April 10, 2015.  He currently serves as the Chairman of Fonu2, a position he has held since December 10, 2014.

28.   **Roger Miguel**, age 60, is a Canadian citizen who currently resides in Savannah, Georgia.  He has been the CEO of Fonu2 since October 1, 2014 and a director of Fonu2 since September 1, 2013.

## FACTS

### Background

29.   On November 18, 2009, Fairway Properties, Inc. ("Fairway") filed a registration statement with the Commission, registering Fairway's securities under Section 12(g) of the Exchange Act.

30.   On August 27, 2012, Fairway filed a Schedule 14C with the Commission in which it advised its stockholders that on that same date, the Fairway board had adopted a resolution approving an amendment to its Articles of Incorporation that increased its authorized shares of common stock to 500 million shares, created 50 million shares of preferred stock, and changed the name of the company to Medient.

31.   A Form 8-K filed on August 27, 2012 further explained that Kumaran had acquired 1,083,000 shares of Fairway/Medient common stock, representing approximately 77% of the company's outstanding common shares at that time, and

that the board of directors had appointed Kumaran to the board, with Kumaran to become CEO, CFO, and Secretary of the company.

32.     Medient's Form 10-Q for the quarter ended September 30, 2012, filed on November 19, 2012, stated that Medient would merge with Kumaran Holdings, LLC ("Kumaran Holdings"), an Oklahoma LLC owned by Kumaran that held the rights to two movies, Storage 24 and Yellow.  Medient acquired Kumaran Holdings on November 26, 2012.

33.     After Medient's securities began publicly trading, Kumaran served as its Chairman, CEO, CFO, and Secretary.

34.     Shapiro held various titles under Kumaran, including Medient's President of Corporate Finance.  Under Kumaran, Shapiro had principal responsibility at Medient for matters involving the public markets, fundraising, and share issuances, and functionally, Shapiro was second only to Kumaran in the company during Kumaran's tenure.

**False and Misleading Statements in Press Releases**

35.     Between July 1, 2013, and at least April 10, 2014, Medient made multiple materially false and misleading statements in its press releases. Specifically:

12

36.     In a July 1, 2013 press release approved by Kumaran, Medient announced that it had "initiated engineering, clearing and grading of the [1,560 acre] property [in Effingham County], as part of a construction plan to have the [S]tudioplex operational by the first quarter of 2014."

37.     In fact, Kumaran knew that Medient "absolutely [did] not" expect (or have anywhere near sufficient funding) to make the full Studioplex operational by the first quarter of 2014.

38.     In a February 10, 2014 press release authored and approved by Kumaran, Kumaran was quoted as saying that Medient had "assets audited and valued at over $44 Million…as of September 30, 2013."

39.     In fact, Kumaran knew that Medient's financial statements had not been audited as of September 30, 2013.  Kumaran later admitted that he understood the difference between audited and unaudited financial statements.

40.     In a March 31, 2014 press release approved by Kumaran, Medient stated that management's best estimate at that time was that the first phase of the Studioplex would be completed by the end of December 2014.

41.     However, construction of the first phase of the Studioplex had not even begun as of March 31, 2014, and the company still had no money to construct the Studioplex at the time of the press release.

42.     Moreover, an internal schedule circulated on March 22, 2014—i.e.,
nine days before the press release—stated that the first phase of the Studioplex was
actually estimated to be completed on April 23, <u>2015</u>.  The internal schedule was
created at Kumaran's direction.

43.     In a March 31, 2014 "letter to shareholders" by Kumaran that
accompanied a different press release on that date, Medient stated that "every
dollar that is being raised [through share issuance transactions] is employed to
make the company stronger.  No one is buying houses or Ferraris with your
money."

44.     Likewise, an April 2, 2014 "letter to shareholders" by Kumaran that
accompanied a press release on that date stated that "ALL money that is raised
from the market is going directly into increasing the company's strength."

45.     In actuality, at the time of the March 31 and April 2 letters, Kumaran
was recklessly spending Medient's money to support a lavish lifestyle for himself
and his entourage.

46.     Among other things, between March 31, 2014 and Kumaran's firing
from Medient on June 9, 2014, Kumaran spent—directly from the company's bank
account—an average of more than $1,700 per day (and a total of more than
$122,000) on travel, cash withdrawals, and personal clothing purchases.  By way

14

of comparison, Medient, as an entire company, reported that it held approximately $68,000 in cash and cash equivalents as of March 31, 2014.

47.     Kumaran had the ultimate authority over each false and misleading statement in Medient's press releases outlined above.

48.     Kumaran also provided substantial assistance to Medient in making each of the false and misleading statements in Medient's press releases outlined above.

49.     A reasonable shareholder would have considered each of the above-described false and misleading statements to be important in making investment decisions.

### False and Misleading Statements in Public Filings

50.     Between January 22, 2014 and at least March 31, 2014, Medient also made multiple materially false and misleading statements in its public filings.

51.     On January 22, 2014, Medient filed a Preliminary Schedule 14C ("Pre-14C") with the Commission.  Medient subsequently filed a Revised Preliminary Schedule 14C ("Pre-14C/A") on February 13, 2014, followed by a Definitive Schedule 14 ("Definitive 14C") on March 17, 2014.

52.     The Schedules 14C (also known as "information statements" under Section 14(c) of the Exchange Act [15 U.S.C. § 78n(c)] and Rule 14c-1 thereunder

[17 C.F.R. § 240.14c-1]) provided notice to Medient's shareholders that the company had received approval from holders of a majority of its shares to increase Medient's authorized shares of common stock from 500 million to 5 billion.

53.     Medient stated in each of the three Schedule 14C filings that it had "not identified any potential investors" and had "not entered into any agreements relating to any potential investment in the Company or otherwise pursuant to which [it would] issue shares of common stock."  Moreover, in the Pre-14C/A and Definitive 14C, Medient stated that it had "no current plans to issue the additional shares."  Each of those statements was false and misleading.

54.     Specifically, Shapiro spent a great deal of time between January and March 2014 working directly with actual and potential Medient investors that were to (and ultimately did) receive tens or even hundreds of millions of Medient shares in transactions specifically predicated on Medient increasing its authorized shares.

55.     Shapiro knew when the statements were made that the representations that Medient had not identified or entered into any agreements with any potential investors and had no current plans to issue additional shares were inaccurate.  To the contrary, Shapiro was, at the time, orchestrating (and in some cases, finalizing) specific financial transactions with potential investors that would necessarily involve the issuance of additional shares.

16

56.   Kumaran signed and approved the Schedules 14C for filing, and had ultimate authority over the materially false and misleading statements therein.

57.   Kumaran also knowingly provided substantial assistance to Medient in the making of materially false and misleading statements in the Schedules 14C.

58.   Shapiro, who was primarily responsible for negotiating and documenting the multiple share issuance transactions and also helped to draft and review the relevant public filings, also knowingly provided substantial assistance to Medient in the making of materially false and misleading statements in the Schedules 14C.  Shapiro also repeatedly referenced the importance of the filings while negotiating the very deals with "potential investors" that the filings disclaimed.

59.   Medient's annual report for 2013, filed with the Commission on March 31, 2014 (the "Form 10-K"), also contained false and misleading statements.

60.   First, Medient asserted in the Form 10-K that it licensed video game rights, but Medient never owned or licensed the rights to any video games.

61.   Second, Medient claimed in the Form 10-K that its management would do everything it could to avoid manipulation of the market for its stock, including not publishing false and misleading press releases.  As alleged above,

Medient published multiple false and misleading press releases between at least July 1, 2013 and April 10, 2014.

62.   Third, Medient asserted in the Form 10-K that it had sufficient investor capital to cover overhead expenses, despite the fact that the company had an operational budget of less than one year and, thus, lacked the capital to meet cash needs on a long-term basis.

63.   Shapiro knowingly provided substantial assistance in connection with the making of the third false and misleading statement in the Form 10-K.

64.   Specifically, Shapiro drafted the statement that Medient had sufficient investor capital to cover overhead expenses, and he did so after Medient's auditor raised the possibility that a "going concern" note would be needed if the prior version of the Form 10-K was not changed.  Shapiro knew at the time that more pessimistic statements in a March 21, 2014 draft of the Form 10-K—that the company did not have capital sufficient to meet its cash needs on a long-term basis, and had an operational budget of less than one year—should have been included in the ultimately-filed version of the Form 10-K.

65.   Kumaran signed and approved the Form 10-K for filing, knowing that it contained materially false and misleading statements.  Kumaran also had

ultimate authority over each of the materially false and misleading statements therein.

66.     Kumaran knew, or was severely reckless in not knowing, that the statements in the Form 10-K were false when made, and he also knowingly provided substantial assistance to Medient in making the materially false and misleading statements in the Form 10-K.

67.     A reasonable shareholder would have considered each of the above-described false and misleading statements in Medient's public filings to be important in making investment decisions.

## Medient Share Issuances and Promissory Note Backdating

68.     Throughout the time that Medient was making the above-alleged false and misleading statements in its press releases and public filings, Medient was also secretly issuing billions of shares of its common stock to third-party microcap financing companies at a deep discount to the prices available to regular investors in the public market.

69.     Between January 2014 and June 2014 alone, Medient issued approximately 2 billion shares of its common stock.

70.     These share issuance transactions were principally orchestrated, negotiated, and documented by Shapiro, with Kumaran thereafter approving and

executing documents as necessary. Hence, Shapiro and Kumaran were both necessary participants and substantial factors in the share issuances, and they both knowingly provided substantial assistance in effectuating the share issuances.

71.   Medient's massive share issuances typically were made in exchange for direct or indirect funding from third-party microcap financing companies.

72.   The funding that Medient received in exchange for the share issuances meant, among other things, that Shapiro could continue to draw a salary from Medient and that Kumaran could continue to use Medient's bank account to support his "Hollywood" lifestyle.

73.   The share issuances—which were not timely disclosed to the investing public as required by the federal securities laws—caused significant shareholder dilution, in that preexisting Medient shareholders' ownership percentages were dramatically reduced without their knowledge.

74.   There was no Securities Act registration statement ever filed or in effect for the offer or sale of any Medient securities to the third party microcap financing companies.

75.   Typically, the share issuances were made pursuant to so-called "aged debt" transactions, in which microcap financing companies agreed to pay off third-party debts owed by Medient in exchange for convertible promissory notes.

20

76.     The convertible promissory notes entitled the microcap financing companies to obtain unrestricted shares of Medient common stock at an approximate 35% to 38% discount to the then-applicable market price of the stock available to the investing public.

77.     The third-party debts being paid off by the microcap financing companies were purportedly evidenced by "original" promissory notes between Medient and the third parties.

78.     Certain purported "original" promissory notes between Medient and the third parties were either backdated or fabricated by Shapiro and Kumaran in order to give the appearance of being six months old or older.

79.     The promissory notes were backdated and/or fabricated in order to mislead the Medient transfer agent into believing that the notes were six months old or older, which in turn let Medient invoke purported exemptions to the securities registration requirements to immediately compensate the microcap financing companies with purportedly unrestricted shares of Medient stock (which could thereby be immediately dumped into the public market) in exchange for the assumption of the notes.

80.     More specifically, in March 2014, Medient, through Shapiro, negotiated a convertible debt transaction with a microcap financing company,

pursuant to which the microcap financing company agreed to assume a debt owed by Medient to Debtholder A.

81.     Debtholder A had provided certain legal and business services to Medient in 2013, and on or about September 20, 2013, he invoiced Medient for those services.

82.     The debt owed to Debtholder A was an ordinary debt for services rendered, but in March 2014, six months after Debtholder A invoiced Medient, the company executed a convertible debt transaction with a microcap financing company pursuant to which the microcap financing company was ultimately issued unrestricted Medient shares in exchange for assuming the debt owed to Debtholder A.

83.     A purported promissory note evidencing the underlying debt owed to Debtholder A states that it was "issued September 20, 2013," but the note was actually created by Shapiro on March 19, 2014—i.e., at the precise time that Shapiro was negotiating with the microcap financing company to assume the debt owed to Debtholder A.

84.     The purported Debtholder A promissory note prepared by Shapiro constituted a false and misleading statement to Medient's transfer agent that was used to deceive the transfer agent into issuing unrestricted shares of Medient stock

22

to the microcap financing company that assumed the note (and the financier would not have issued the shares without the Debtholder A note being sufficiently aged).

85.    The purported Debtholder A note was signed by Kumaran on behalf of Medient, and Kumaran had ultimate authority over Medient's false and misleading statements therein.

86.    Kumaran was a necessary participant and substantial factor in the share issuances that were ultimately effectuated pursuant to the microcap financing company's assumption of the Debtholder A note, and he knowingly provided substantial assistance in the making of the false and misleading statements in the Debtholder A note itself.

87.    Shapiro also was a necessary participant and substantial factor in the share issuances that were ultimately effectuated pursuant to the microcap financing company's assumption of the Debtholder A note, and he too knowingly provided substantial assistance in the making of the false and misleading statements in the Debtholder A note itself.

88.    Medient also backdated and/or fabricated at least two other promissory notes in connection with aged debt transactions: a $385,000 note between Medient and an individual named Debtholder B, and a $500,000 note between Medient and an entity, Debtholder C.

23

89.     The purported Debtholder B note and the purported Debtholder C note were both created at least six months after the notes' purported dates.

90.     Both the purported Debtholder B note and the purported Debtholder C note were utilized in aged debt transactions negotiated and documented by Shapiro pursuant to which the original third-party Medient debtholders were paid by microcap financing companies, and the microcap financing companies were in turn issued "restated" convertible promissory notes by Medient that purportedly replaced the "original" promissory notes.

91.     Shapiro created the Debtholder B note six months after its purported date and was the individual at Medient responsible for negotiating, documenting, and controlling each of the aged debt transactions in which the Debtholder B note and the Debtholder C note were used.

92.     The purported Debtholder B note and the purported Debtholder C note constituted materially false and misleading statements to Medient's transfer agent, which ultimately issued unrestricted shares of Medient stock to the microcap financing companies that assumed the notes (and would not have done so without the notes being sufficiently aged).

93.     The Debtholder B note and the Debtholder C note were both signed on behalf of Medient by Kumaran, and Kumaran had ultimate authority over Medient's false and misleading statements therein.

94.     Kumaran also was a necessary participant and substantial factor in the share issuances that were ultimately effectuated pursuant to the microcap financing companies' assumptions of the Debtholder B note and the Debtholder C note, and he knowingly provided substantial assistance in the making of the false and misleading statements in the notes themselves.

95.     Likewise, Shapiro was a necessary participant and substantial factor in the share issuances that were ultimately effectuated pursuant to the microcap financing companies' assumptions of the Debtholder B note and the Debtholder C note, and he too knowingly provided substantial assistance in the making of the false and misleading statements in the notes themselves.

96.     By falsifying the "original" promissory notes to appear as though Debtholder A, Debtholder B, and Debtholder C purportedly held the notes for six months or longer, Medient was able to relieve itself of over $800,000 in debt obligations, as the microcap financing companies paid Medient debts in exchange for the right to obtain unrestricted shares of Medient stock at a large discount to market price under the "restated" convertible notes.

25

97.     That in turn allowed Medient to continue its operations, and for Shapiro and Kumaran to obtain money and/or property as a result.

## Double Conversions of Aged Debt

98.     In addition to the above-discussed promissory note backdating that Medient undertook in connection with its aged debt transactions, Medient, in at least two instances, again through Shapiro's orchestration, entered into wrongful transactions whereby microcap financing companies re-exercised conversion rights under already-exhausted convertible promissory notes, thereby obtaining extra shares of Medient stock to which they should not have been entitled.

99.     Specifically, the full $385,000 of the Debtholder B note discussed above was sold to microcap financing companies in aged debt transactions in mid-to-late 2013, in exchange for the right to obtain unrestricted shares of Medient stock at a large discount to market price.

100.    However, in spring 2014, Shapiro negotiated for Medient to sell $30,000 of the Debtholder B note again, as part of a separate aged debt/share issuance transaction.

101.    The second sale of the Debtholder B note was, like the first, in exchange for the right to obtain unrestricted shares of Medient stock at a large discount to market price.

102.   The second sale of the Debtholder B note was based upon materially false and misleading statements about the age of the note and that a portion of the note was still available, and was part of a fraudulent scheme to effectuate the issuance of unrestricted shares of Medient stock.

103.   Both the first and second sales of the Debtholder B note were led by Shapiro on Medient's behalf, and Kumaran signed all relevant paperwork for Medient (including the purported new convertible notes for the microcap financing companies).

104.   Kumaran and Shapiro were necessary participants and substantial factors in the second set of share issuances that were undertaken in connection with the Debtholder B note, and they provided substantial assistance in effectuating those issuances.

105.   Kumaran and Shapiro also provided substantial assistance to Medient in its double sale of the Debtholder B note.

106.   In addition to its double-selling of the Debtholder B note, Medient, again through Shapiro, also allowed a debtholder called Debtholder D to twice convert a $2 million convertible promissory note into unrestricted shares of Medient stock.

107.   As reported in Medient's Form 10-K for 2012, filed on April 16, 2013, Debtholder D, " a media investor, made a loan of $2,000,000 towards the production cost of the film <u>Storage 24</u>….[that] was assumed by the Company…as of October 18, 2012."

108.   In exchange for its loan, Debtholder D was issued an undated promissory note by a privately-held Medient predecessor called Medient Unstoppable Limited.  It is that note that was assumed by Medient as of October 18, 2012.  The note was, according to Medient, originally issued to Debtholder D on June 12, 2011.

109.   On March 19, 2013, Debtholder D and Medient entered into a "Common Stock Purchase Agreement," pursuant to which the $2 million in debt was purportedly made convertible into shares of Medient stock at $.69 per share.

110.   On or about June 18, 2013, Debtholder D exercised its convertibility rights under the Common Stock Purchase Agreement and received 2,898,551 unrestricted shares of Medient common stock.

111.   The June 18, 2013 share issuance to Debtholder D was orchestrated by Shapiro on behalf of Medient, and Kumaran signed the relevant documents on behalf of Medient, including the Common Stock Purchase Agreement.

28

112.   According to both the Common Stock Purchase Agreement and a Medient public filing signed by Kumaran, the 2,898,551 unrestricted shares of Medient stock that Debtholder D received on or about June 18, 2013 were in exchange for the conversion of $2 million in liabilities (at approximately $.69 per share) that Medient previously owed to Debtholder D.

113.   Nevertheless, in December 2013, Medient and Debtholder D, in a letter signed by Kumaran, purported to amend the Common Stock Purchase Agreement so as to lower the "purchase price" from the $.69 per share at which Debtholder D had already fully converted its $2 million in Medient debt to $.20 per share, which, according to the amendment, was designed to "cause…additional shares of 5,000,000 to be issued to [Debtholder D] and/or its assignees."[1]

114.   Subsequently, in February 2014, 5 million additional shares of unrestricted Medient stock were issued to a Debtholder D assignee ("Debtholder D Assignee").

115.   The February 2014 Debtholder D assignee share issuance was predicated on the original promissory note between Medient Unstoppable Limited and Debtholder D and the purportedly still-existing $2 million debt reflected

---

[1]      $2 million worth of shares at $.20 per share would actually be 10 million shares, not 5 million shares, but the December 2013 amendment to the Common Stock Purchase Agreement says otherwise, and as alleged infra, ultimately, 5 million additional shares were issued to a Debtholder D  assignee under the December 2013 amendment.

therein, despite the fact that Medient had, in June 2013, issued 2,898,551 shares of unrestricted stock to Debtholder D in exchange for the payment of that same debt.

116.   Medient's double issuance of stock as payment for the Debtholder D debt constituted a materially false and misleading statement, and was part of a fraudulent scheme to effectuate the issuance of unrestricted shares of Medient stock.

117.   Shapiro orchestrated the February 2014 Debtholder D Assignee-Medient transaction on behalf of Medient, just as he orchestrated the June 2013 Debtholder D-Medient transaction.

118.   Kumaran and Shapiro were necessary participants and substantial factors in the share issuances that were undertaken in connection with the Common Stock Purchase Agreement and the Debtholder D-Medient Unstoppable Limited promissory note, and they provided substantial assistance in effectuating those issuances.

119.   Kumaran and Shapiro also provided substantial assistance to Medient in its double issuance of stock as payment for the Debtholder D debt.

## Kumaran's Termination and Shapiro's Ascendance to CEO

120.   The investigative Staff of the Commission first sent Medient and Kumaran investigative subpoenas on April 25, 2014, and the Staff took Kumaran's testimony on June 5, 2014.

121.   On June 9, 2014, four days after the Staff took Kumaran's testimony, Kumaran was terminated as Medient's CEO and Chairman.

122.   Kumaran's termination took place at a board of directors meeting.  At that same meeting, Shapiro was appointed to replace Kumaran as Medient's CEO.

123.   Kumaran's termination, and Shapiro's appointment as his replacement, was orchestrated by Shapiro with the Medient directors (other than Kumaran) in advance of the June 9, 2014 meeting.

124.   As part of the June 9, 2014 meeting, the Medient board approved a board resolution to issue Shapiro 40 million shares of Series A preferred Medient stock.

125.   The 40 million shares of Series A preferred Medient stock, which were actually issued to Shapiro on June 12, 2014, gave Shapiro supermajority voting rights of 250 votes per share, or 10 billion total votes, meaning that Shapiro would, at all times thereafter, have majority shareholder voting rights in Medient.

126.    Shapiro still holds his majority shareholder voting rights in Medient to this day.

## Shareholder Conference Call

127.    On June 12, 2014, approximately three days after becoming Medient's CEO, Shapiro organized and led a Medient shareholder conference call.

128.    On that call, among other things, Shapiro asserted that at least one of the reasons for Kumaran's termination was the dilution of Medient stock that had occurred during Kumaran's tenure as CEO and Chairman.

129.    Shapiro further asserted on the June 12, 2014 shareholder conference call that "the days of endless dilution" were over now that Shapiro was the CEO. That statement was materially false and misleading for at least two reasons.

130.    First, Shapiro omitted the fact that Shapiro himself, and not Kumaran, was the primary orchestrator of the massively dilutive and typically undisclosed share issuances that preceded Kumaran's firing in June 2014.  Again, Shapiro himself had engineered nearly all of the Medient share issuances that took place under Kumaran.

131.    Second, Medient's continued issuance of large amounts of additional shares shortly after Shapiro took over as CEO shows that Shapiro never intended to adhere to this promise.

132.   Medient's last Form 10-Q (for the quarter ended September 30, 2014) states that it had 2,932,187,169 shares issued and outstanding as of November 19, 2014.

133.   Hence, Medient issued over 1 billion additional shares of stock after Shapiro became CEO (in just over five months' time), a further indication that Shapiro's statement on the June 12, 2014 conference call was false and misleading.

134.   A reasonable shareholder would have considered Shapiro's false and misleading statements on the June 12, 2014 conference call to be important in making investment decisions.

## Trading Suspension and Aftermath

135.   On June 25, 2014, approximately two weeks after Shapiro became Medient's CEO, the Commission issued an Order of Suspension of Trading in Medient's securities, pursuant to Section 12(k) of the Exchange Act.

136.   The trading suspension was issued because of questions regarding the accuracy and adequacy of publicly available information about the company, including, among other things, its total shares outstanding and its operations. Among other things, Medient's Form 10-Q filed on May 16, 2014 reported that as of that date it had 661,250,840 shares of common stock issued and outstanding. However, as of June 20, 2014, Medient actually had 2,263,987,118 shares issued

and outstanding, and Medient had not issued any press releases or made any filings with the Commission subsequent to the May 16, 2014 Form 10-Q in which it disclosed its true number of outstanding shares.

137.   The trading suspension lasted for ten business days before expiring on July 9, 2014.

138.   After the trading suspension expired, Medient's securities traded on the so-called "Grey Market."

139.   According to the OTC Markets Group, Inc. website, a "'Grey Market' [security]…is a security that is not currently traded on the OTCQX, OTCQB or OTC Pink marketplaces.  Broker-dealers are not willing or able to publicly quote [such] securities because of a lack of investor interest, company information availability or regulatory compliance."  See OTC Markets "Glossary," available at http://www.otcmarkets.com/research/glossary.

140.   On June 24, 2014, the day before the trading suspension, Medient's common stock was quoted at $.0013 per share.  On July 10, 2014, the day after the trading suspension expired, Medient's common stock was quoted at $.0004 per share.  After July 10, 2014, with only a handful of exceptions, the stock was not quoted at more than $.0007 per share, and it has essentially been quoted at $.0001 per share since January 2015.

34

141.   As discussed above, Medient's primary method of raising capital was to issue shares of its common stock (or the right to obtain shares of its common stock) to microcap financing companies, either in exchange for direct funding or in exchange for the payment of third-party debt.

142.   Because of that, when Medient's stock moved to the "Grey Market," Shapiro no longer had access to capital through his fraudulent share issuance schemes.

143.   Accordingly, Shapiro began looking for other public issuers that would allow him to obtain capital.

**Fonu2-to-Medient Transactions and Miguel's Insider Trading**

144.   On July 7, 2014, Shapiro personally formed a Georgia LLC called Studioplex City, LLC ("Studioplex City").  Shapiro was the sole member of Studioplex City.

145.   Studioplex City was a "special purpose vehicle."  Special purpose vehicles are commonly formed in the film industry in connection with making a particular film or films.

146.   Studioplex City was a special purpose vehicle owned by Shapiro personally, and not affiliated in any way with Medient, despite the fact that Shapiro formed Studioplex City while the CEO of Medient.  Studioplex City and Medient

never had any business relationship, and Shapiro was the sole point of commonality between the two entities.

147.   Studioplex City acquired and held a single asset: a purported two-movie directing contract with a well-known Hollywood actor and director.

148.   On December 8, 2014, Fonu2 entered into a purchase agreement with Studioplex City and Shapiro, pursuant to which Fonu2 paid Shapiro 2,500,000 Series B convertible preferred shares of Fonu2 stock in exchange for 100% of the membership interests of Studioplex City.

149.   Shapiro's 2,500,000 Series B convertible preferred shares of Fonu2 stock gave him 67% of the voting securities of Fonu2.

150.   Also on December 8, 2014, Shapiro was appointed as director and Chairman of Fonu2.

151.   Between at least November 2014 and February 2015, Shapiro and Miguel worked to effectuate a pair of transactions pursuant to which Fonu2 would eventually acquire essentially all of Medient's assets.

152.   Miguel signed a nondisclosure agreement in November 2014 in connection with the Medient-to-Fonu2 transactions, with the understanding that there would be "sharing of non-public information, on both sides."

36

153.   Miguel and Shapiro both understood that the pending Medient-to-Fonu2 transactions needed to be kept confidential because otherwise individuals could take advantage of information about the pending transactions to make a profit in the stock market.

154.   Nevertheless, Miguel, while working to finalize the Medient-to-Fonu2 transactions as Fonu2's director and CEO, purchased approximately $20,000 worth of shares of Fonu2 in the public market between late December 2014 and early January 2015.

155.   Miguel's purchases were made while he was aware of the pending Medient-to-Fonu2 transactions.  They were also based at least in part on his knowledge of the upcoming Medient-to-Fonu2 transactions.

156.   Fonu2's common stock closed at $.041 per share on February 10, 2015.

157.   At 4:39 PM on February 10, 2015—after the close of the OTC Markets' open market hours—the first Medient-to-Fonu2 transaction was disclosed publicly, in what Miguel then referred to as a "major event for Fonu2 and its shareholders."

158.   In the February 10, 2015 transaction, Fonu2 acquired essentially all of Medient's assets except for Medient's rights to the film <u>Yellow</u>.  Fonu2 acquired the rights to <u>Yellow</u> two days later, on February 12, 2015.

159.   On February 11, 2015, Fonu2's stock opened at $.065 per share, and it closed at $.097 per share the same day.

160.   Miguel's December 2014 and January 2015 Fonu2 stock purchases were worth approximately $50,000 at the close of trading on February 11, 2015, representing a potential profit of approximately $30,000.

**<u>Fonu2 Share Issuances and Promissory Note Backdating</u>**

161.   At the time Shapiro became Fonu2's Chairman on December 8, 2014, Fonu2 had 617,452,617 shares of its common stock issued and outstanding.

162.   By December 22, 2014, Fonu2 had 1,065,115,769 shares of its common stock issued and outstanding.

163.   On December 22, 2014, Fonu2 obtained the "unanimous written consent of its Board of Directors"—which consisted at the time of Shapiro, Miguel, and an additional director no longer associated with Fonu2—to effectuate a 1 for 400 reverse split of its common stock.

164.   The reverse split became effective on or about February 3, 2015, and reduced Fonu2's issued and outstanding shares of common stock to approximately 2,800,000 as of that date.

165.   In its last public filing addressing the issue—a Form 8-K filed on April 5, 2016—Fonu2 reported that it had 847,689,235 post-split shares of its common stock issued and outstanding.  That equates to 339,075,694,000 pre-split shares of Fonu2 common stock, 338,458,241,383 of which were issued after Shapiro became Fonu2's Chairman.

166.   The majority of Fonu2's share issuances since Shapiro's appointment as Fonu2's Chairman have been to entities that regularly fund microcap issuers, in an effort to generate operating capital.

167.   Moreover, just as Shapiro orchestrated the backdating of promissory notes at Medient, in at least one known instance he orchestrated the backdating of a promissory note at Fonu2, with substantial assistance from Miguel.

168.   Specifically, a former Medient employee was owed approximately $24,000 by Medient for ordinary business expenses, and she provided an expense report in that amount to Shapiro on or about February 12, 2015.

169.   The former employee and her counsel spent the next several months attempting to collect the debt from Shapiro and Fonu2, and finally, in August

2015, Shapiro agreed that Fonu2 would pay the debt no later than September 15, 2015.

170.   The former employee's debt was ultimately paid on September 1, 2015 by a microcap financing company.  On September 2, 2015, Fonu2—at Shapiro's direction—issued a purported "replacement Convertible [promissory] note" to the microcap financing company, with the "replacement" note supposedly replacing a preexisting promissory note between the former employee and Fonu2 dated February 12, 2015.

171.   The financing company subsequently exercised conversion rights under its "replacement" note on September 17, 2015, September 22, 2015, and September 29, 2015.

172.   There was no Securities Act registration statement in effect for the shares that Fonu2 issued to the financing company in connection with the debt owed to the former employee.

173.   The purported "original" note is dated February 12, 2015 and is signed solely by Miguel.

174.   The former employee has never seen the "original" note that supposedly was executed in her favor on February 12, 2015, and was never a party to any promissory note with either Fonu2 or Medient.

40

175.   Moreover, the purported February 12, 2015 note was actually created in mid-August 2015 by Shapiro.

176.   The purported February 12, 2015 promissory note constituted a materially false and misleading statement to Fonu2's transfer agent, which would not have issued unrestricted shares of Fonu2 stock to the financing company without the note being sufficiently aged.

177.   Shapiro and Miguel were necessary participants and substantial factors in effectuating the share issuances undertaken in connection with the February 12, 2015 promissory note, and they provided substantial assistance in effectuating those issuances.

178.   Shapiro and Miguel also knowingly provided substantial assistance in the making of the false and misleading statements in the February 12, 2015 promissory notes.

**Missing and Delinquent Medient Public Filings**

179.   In addition to the numerous false and misleading statements and omissions made by Defendants, and their fraudulent scheme detailed above, both Medient and Shapiro failed to file timely numerous Commission-required Forms.

180.   For example, Medient failed to make several required disclosures on Commission Form 8-K.

181.   Form 8-K is the "current report" that public companies are required to file with the Commission to disclose certain major events that shareholders are entitled to know about.

182.   Among other things, Form 8-K requires an issuer to disclose when it enters into a "material definitive agreement"; when it terminates such an agreement; when it completes an "acquisition or disposition of assets"; when it makes "unregistered sales of equity securities"; and when there is a "departure of directors or certain officers."  Medient failed to file required Forms 8-K as follows.

183.   <u>First</u>, Medient failed to file required Forms 8-K with respect to its many unregistered sales of equity securities.  It issued approximately 2 billion shares of its common stock between January 2014 and June 2014—almost always pursuant to agreements with microcap financing companies that gave the companies shares at a heavy (approximately 35-38%) discount to market price— but never reported the individual share issuances or the terms of the agreements with the microcap financing companies.

184.   At least two of Medient's share issuance transactions between January 2014 and June 2014 involved the issuance of over 5% of Medient's last reported outstanding shares at that time.

185.   Each of Medient's agreements with the microcap financing companies was material to Medient and obligated Medient to issue a material amount of its common stock at large discounts to market price.

186.   Medient's agreements with the microcap financing companies were contracts with underwriters, in that the microcap financing companies purchased securities from Medient with a view to the distribution of those securities, and/or directly or indirectly participated in the distribution of those securities.

187.   Medient's agreements with the financing companies were also contracts upon which Medient's business was substantially dependent.

188.   Second, Medient never filed any Forms 8-K disclosing its February 2015 transactions with Fonu2.

189.   Notably, Fonu2 considered the February 10, 2015 transaction between the companies sufficiently material so as to file a Form 8-K of its own about the transaction, but Medient did not file a Form 8-K to disclose either its entry into a material definitive agreement with Fonu2 or its completion of the disposition of a significant amount of its assets to Fonu2.

190.   In fact, no Medient filing even mentioned Fonu2 until February 27, 2015.

191.   <u>Third</u>, Medient failed to file required Forms 8-K in the aftermath of the December 2014 resignations of its Chairman and its CFO.

192.   Shapiro knew that a Form 8-K should have been filed upon the CFO's resignation, but made no effort to timely file a Form 8-K in connection with the CFO's resignation.

193.   As such, Shapiro provided substantial assistance to Medient in its failure to timely file a Form 8-K in connection with the CFO's resignation.

194.   Shapiro also failed to timely file certain Commission Forms that he was required to file personally.

195.   Specifically, if a person acquires beneficial ownership of over 5% of a class of equity securities registered under Section 12 of the Exchange Act, that person has ten days to file a Schedule 13D with the Commission.

196.   In November 2012, Shapiro acquired over 5% of Medient's common stock.

197.   Shapiro was the beneficial owner of over 5% of Medient's common stock for at least one year.

198.   Shapiro did not file a Schedule 13D with regard to his greater-than-5% Medient stock ownership until April 2015.

44

199.   In addition, directors or officers of an issuer are required to report their ownership in the securities of the issuer, or any change in their ownership interest of such securities, on Commission Form 3 (initial statements of ownership), Form 4 (changes in ownership) and/or Form 5 (annual statements of changes in ownership that can also be reported on Form 4).

200.   A Form 3 must be filed within ten days of a triggering event (i.e., becoming an officer, director, or 10% or greater shareholder), a Form 4 generally is due by the end of the second business day following the triggering transaction, and a Form 5 is due 45 days after the end of the company's fiscal year, to report holdings and transactions that should have been reported during the fiscal year but were not.

201.   Again, Shapiro became Medient's CEO on June 9, 2014, and was issued 40 million shares of Series A preferred Medient stock on June 12, 2014.

202.   Shapiro did not file a Form 3 until April 3, 2015.

203.   Shapiro never filed a Form 4 with regard to the 40 million shares of Series A preferred stock that he was issued on June 12, 2014.

204.   Shapiro never filed a Form 5 with regard to his tardy Forms 3 and 4.

## COUNT I – FRAUD

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
## [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

### (All Defendants)

205.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

206.   From at least March 2013 through September 2015, Defendants, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

    a.   employed devices, schemes, and artifices to defraud;

    b.   made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

207.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud, made untrue statements

of material facts and omitted to state material facts, and engaged in fraudulent acts, practices, and courses of business.  In engaging in such conduct, Defendants acted with scienter; that is, with an intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth.

208.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II – AIDING AND ABETTING FRAUD

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

### (Kumaran, Shapiro, and Miguel)

209.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

210.   As alleged herein and as set forth above, each of the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] when they, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities.

211.  Defendants Kumaran, Shapiro, and Miguel, knowingly or with the requisite scienter, provided substantial assistance to these violations.

212.  By reason of the foregoing, Defendants Kumaran, Shapiro, and Miguel aided and abetted, and, unless enjoined, will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT III – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

#### (All Defendants)

213.  Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

214.   From at least March 2013 through September 2015, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

215.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

216.   While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth.

217.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT IV – AIDING AND ABETTING FRAUD

### Aiding and Abetting Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

### (Kumaran, Shapiro, and Miguel)

218.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

219.   As alleged herein and as set forth above, each of the Defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] when they, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

220.   Defendants Kumaran, Shapiro, and Miguel, knowingly or with the requisite scienter, provided substantial assistance to these violations.

221.   By reason of the foregoing, Defendants Kumaran, Shapiro, and Miguel aided and abetted, and, unless enjoined, will continue to aid and abet, violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

### (All Defendants)

222.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

223.   From at least March 2013 through September 2015, Defendants, in the offer and sale of the securities described herein, by the use of means and

50

instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

224. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## **<u>COUNT VI – AIDING AND ABETTING FRAUD</u>**

**Aiding and Abetting Violations of
Sections 17(a)(2) and 17(a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

**(Kumaran, Shapiro, and Miguel)**

225. Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

226.   As alleged herein and as set forth above, each of the Defendants violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] when they, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

   a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   b.   engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

227.   Defendants Kumaran, Shapiro, and Miguel, knowingly or with the requisite scienter, provided substantial assistance to these violations.

228.   By reason of the foregoing, Defendants Kumaran, Shapiro, and Miguel aided and abetted, and, unless enjoined, will continue to aid and abet, violations of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT VII – SALE OF UNREGISTERED SECURITIES

**Violations of Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. §§ 77e(a) and 77e(c)]**

**(All Defendants)**

229.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

230.   By their conduct as alleged above, Defendants, directly or indirectly, singly or in concert with others:

    a.   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

    b.   for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or

    c.   made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or

otherwise,  securities as to which no registration statement had been filed.

231.   In addition, Kumaran, Shapiro, and Miguel were all "necessary participants" and "substantial factors" in the Medient and Fonu2 unregistered sales of securities.

232.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and §77e(c)].

## COUNT VIII – AIDING AND ABETTING
## SALE OF UNREGISTERED SECURITIES

### Aiding and Abetting Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]

### (Kumaran, Shapiro, and Miguel)

233.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

234.   As alleged herein and as set forth above, each of the Defendants violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and §77e(c)] when they, directly or indirectly, singly or in concert with others:

    a.   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or

medium of a prospectus or otherwise, securities as to which no

registration statement was in effect;

b.  for the purpose of sale or delivery after sale, carried or caused to be

carried through the mails or in interstate commerce, by any means or

instruments of transportation, securities as to which no registration

statement was in effect; or

c.  made use of any means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell

or offer to buy, through the use or medium of a prospectus or

otherwise, securities as to which no registration statement had been

filed.

235.  Defendants Kumaran, Shapiro, and Miguel, knowingly or with the

requisite scienter, provided substantial assistance to these violations.

236.  By reason of the foregoing, Defendants Kumaran, Shapiro, and

Miguel aided and abetted, and, unless enjoined, will continue to aid and abet,

violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and

§77e(c)].

## COUNT IX – FAILURE TO REPORT DIRECTOR HOLDINGS

### Violations of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder
### [15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3]

### (Shapiro)

237.    Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

238.    Defendant Shapiro was an officer of Medient from at least June 9, 2014 until at least April 10, 2015.

239.    By engaging in the conduct described above, Shapiro failed to timely file statements accurately reflecting his beneficial ownership of Medient's common stock, and annual statements accurately reflecting his beneficial ownership of Medient's common stock.

240.    By reason of the foregoing, Shapiro violated and, unless enjoined, will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## COUNT X – FAILURE TO REPORT 5%+ BENEFICIAL OWNERSHIP

### Violation of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder
### [15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1]

### (Shapiro)

241.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

242.   Defendant Shapiro, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to timely file with the Commission a statement containing the information required by Schedule 13D [17 C.F.R. § 240.13d-101].

243.   By reason of the foregoing, Defendant Shapiro violated and, unless enjoined, will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

## COUNT XI – FAILURE TO COMPLY WITH REPORTING PROVISIONS

### Violations of Sections 13(a) of the Exchange Act and
### Rules 12b-20, 13a-1, and 13a-11 Thereunder
### [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11]

### (Medient)

244.    Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

245.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-11] require issuers of securities registered with the Commission pursuant to Section 12 of the Exchange Act to timely file with the Commission factually accurate annual and current reports.

246.    Through the conduct described above, Medient violated and, unless enjoined, will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-11].

## COUNT XII – AIDING AND ABETTING FAILURE
## TO COMPLY WITH REPORTING PROVISIONS

**Aiding and Abetting Violations of Sections 13(a) of the Exchange Act and
Rules 12b-20, 13a-1, and 13a-11 Thereunder
[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11]**

**(Kumaran and Shapiro)**

247.    Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

248.    As alleged herein and as set forth above, Medient violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-11] by failing to timely file factually accurate annual and current reports with the Commission.

249.    Defendant Kumaran, knowingly or with the requisite scienter, provided substantial assistance to Medient in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§240.12b-20 and 240.13a-1].

250.    Defendant Shapiro, knowingly or with the requisite scienter, provided substantial assistance to Medient in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-11].

251.   By reason of the foregoing, Defendants Kumaran and Shapiro aided and abetted, and, unless enjoined, will continue to aid and abet, violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, and 240.13a-11].

## COUNT XIII – FALSE STATEMENTS IN INFORMATION STATEMENT

### Violations of Section 14(c) of the Exchange Act and Rule 14c-6 Thereunder [15 U.S.C. § 78n(c) and 17 C.F.R. § 240.14c-6]

### (Medient)

252.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

253.   Medient, by engaging the conduct described above, filed an information statement with the Commission that contained statements which, at the time and in the light of the circumstances under which the statements were made, were false and misleading with respect to material facts therein, and/or omitted to state material facts necessary in order to make the statements therein not false or misleading.

254.   Medient knowingly, intentionally, and/or recklessly made untrue statements of material facts and omitted to state material facts in its information statement.  In engaging in such conduct, Medient acted with scienter; that is, with

an intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth.

255.   Through the conduct described above, Medient violated and, unless enjoined, will continue to violate, Section 14(c) of the Exchange Act [15 U.S.C. § 78n(c)] and Rule 14c-6 thereunder [17 C.F.R. § 240.14c-6].

## COUNT XIV – AIDING AND ABETTING
## FALSE STATEMENTS IN INFORMATION STATEMENT

### Aiding and Abetting Violations of
### Section 14(c) of the Exchange Act and Rule 14c-6 Thereunder
### [15 U.S.C. § 78n(c) and 17 C.F.R. § 240.14c-6]

### (Kumaran and Shapiro)

256.   Paragraphs 1 through 204 are hereby re-alleged and incorporated herein by reference.

257.   As alleged herein and as set forth above, Medient violated Section 14(c) of the Exchange Act [15 U.S.C. § 78n(c)] and Rule 14c-6 thereunder [17 C.F.R. §§240.14c-6] by filing an information statement with the Commission that contained statements which, at the time and in the light of the circumstances under which the statements were made, were false and misleading with respect to material facts therein, and/or omitted to state material facts necessary in order to make the statements therein not false or misleading.

61

258.   Defendants Kumaran and Shapiro, knowingly or with the requisite scienter, provided substantial assistance to Medient in its violations of Section 14(c) of the Exchange Act [15 U.S.C. § 78n(c)] and Rule 14c-6 thereunder [17 C.F.R. §§240.14c-6].

259.   By reason of the foregoing, Defendants Kumaran and Shapiro aided and abetted, and, unless enjoined, will continue to aid and abet, violations of Section 14(c) of the Exchange Act [15 U.S.C. § 78n(c)] and Rule 14c-6 thereunder [17 C.F.R. §§240.14c-6].

WHEREFORE, Plaintiff Commission respectfully prays for:

## I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants committed the violations alleged herein.

## II.

Permanent injunctions enjoining Defendants, their officers, directors, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

A permanent injunction further enjoining Defendant Kumaran from aiding and abetting direct or indirect violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], as well Sections 10(b), 13(a), and 14(c) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78n(c)] and Rules 10b-5, 12b-20, 13a-1, and 14c-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.14c-6].

### IV.

A permanent injunction further enjoining Defendant Shapiro from violating, directly or indirectly, Sections 13(d) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d) and 78p(a)], as well as Rules 13d-1 and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1 and 240.16a-3], and from aiding and abetting direct or indirect violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], as well Sections 10(b), 13(a), and 14(c) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78n(c)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 14c-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.14c-6].

63

## V.

A permanent injunction further enjoining Defendant Miguel from aiding and abetting direct or indirect violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)].

## VI.

A permanent injunction further enjoining Defendant Medient from violating, directly or indirectly, Sections 13(a) and 14(c) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78n(c)] and Rules 12b-20, 13a-1, 13a-11, and 14c-6 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.14c-6].

## VII.

An order requiring the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## VIII.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], as well as Section 21A of the Exchange Act [15 U.S.C. § 78u-1] with respect to Defendant Miguel, imposing civil penalties against Defendants.

**IX.**

An order requiring Defendants Medient, Kumaran, and Shapiro to conduct an accounting to determine the precise amount of money and/or property misappropriated as a result of their fraudulent conduct described in this Complaint.

**X.**

An order permanently barring Defendants Kumaran and Shapiro from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**XI.**

An order barring Defendant Miguel, for a period of five (5) years, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**XII.**

An order barring Defendants Kumaran and Shapiro from serving as an officer or director of any public company that has a class of securities registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## XIII.

An order barring Defendant Miguel, for a period of five (5) years, from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## XIV.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated this 23rd day of September, 2016.

Respectfully submitted,


/s/ *W. Shawn Murnahan*[2]
W. Shawn Murnahan
Senior Trial Counsel
Georgia Bar No. 529940
Tel: (404) 842-7669
Email: murnahanw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622

Joshua M. Dickman
Senior Counsel
Georgia Bar No. 210855
Tel: (404) 842-7630
Email: dickmanj@sec.gov

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA  30326-1382
Fax: (703) 813-9364

---

[2]     Pursuant to LR 83.4(c), Plaintiff's counsel certifies that he has read and is familiar with the local rules of this Court.

OF COUNSEL

Edward J. Tarver
United States Attorney

/s/ *Shannon Heath Statkus*
Shannon Heath Statkus
Assistant United States Attorney
Civil Division Chief
SC Bar No. 70410
United States Attorney's Office
Southern District of Georgia
600 James Brown Boulevard
Augusta, Georgia  30901
(706) 826-4526 (telephone)
(912) 652-4991 (facsimile)